USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 07/28/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GAMERUN INC.,

Plaintiff,

-v-

MICHAEL INSALACO,

Defendant.

MICHAEL INSALACO,

Counterclaim Plaintiff,

-v-

GAMERUN INC.,

Counterclaim Defendant.

26-cv-4340 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Defendant/Counterclaim-Plaintiff/Third-Party Plaintiff Michael Insalaco ("Insalaco") moves, pursuant to Federal Rule of Civil Procedure 65, for a temporary restraining order and preliminary injunction. Dkt. No. 19. Insalaco invested $1,300,000 in Plaintiff/Counterclaim-Defendant GameRun Inc. ("GameRun") through a Carta Post-Money Simple Agreement for Future Equity or "SAFE" (the "SAFE Agreement"). He seeks to enjoin GameRun from using, transferring, dissipating, encumbering, or otherwise disposing of any portion of the $1,300,000 he invested in the company, segregating those funds or, in the alternative, segregating the total balance in GameRun's operating accounts up to $1,300,000, and paying any funds to

GameRun's founders, Kristin Boggiano and Kapil Rathi. Dkt. No. 19-1 at 4–7.[1] GameRun opposes the motion. Dkt. No. 29. The Court held a hearing on the motion on July 22, 2026. At the conclusion of the hearing, the Court denied the motion from the bench. This Opinion and Order sets forth the Court's findings of fact and conclusions of law for the purposes of Federal Rule of Civil Procedure 52(a)(1). To the extent any statement labeled as a finding of fact is a conclusion of law, it shall be deemed a conclusion of law, and vice versa.

**FINDINGS OF FACT**

Insalaco is a resident of the State of Nevada and a lawyer. Dkt. No. 20 ("Insalaco Aff.") ¶ 2; Dkt. No. 29-1 ("Boggiano Aff.") ¶ 28.

GameRun is a sports technology start-up with its principal place of business in New York. Dkt. No. 29 at 4; Dkt. No. 22 ("First Amended Complaint" or "FAC") ¶ 9; Boggiano Aff. ¶ 4. Third-Party Defendants Kristin Boggiano ("Boggiano") and Kapil Rathi ("Rathi") are co-founders of GameRun. Insalaco Aff. ¶ 4; Boggiano Aff. ¶¶ 1, 5; Dkt. No. 29 at 4. Boggiano is a resident of the State of New York and an attorney who practices in the area of securities law. Boggiano Aff. ¶¶ 3, 11. Rathi is a resident of the state of New Jersey. *Id.* ¶ 5.

GameRun raises the money for its operations through SAFE agreements and has negotiated multiple SAFE rounds at various valuation caps with multiple investors. *Id.* ¶ 4.[2] Its

[1] In his reply memorandum of law filed on July 17, 2026, Insalaco states that he has "narrow[ed] the primary relief requested to an order: (i) preserving all funds in the GameRun account(s) that received Defendant's March 12, 2026 wire, up to the lesser of $1,300,000 or the lowest intermediate balance of those account(s) since that date, together with any traceable proceeds; (ii) requiring a verified accounting within seventy-two business hours; or (iii) in the alternative, implementing the supervised-escrow arrangement—any of which GameRun may discharge by posting substitute security of $1,300,000." Dkt. No. 40 ¶ 4.

[2] A SAFE is a commoditized mechanism for early-stage companies to obtain funds prior to the issuance of equity that was created in 2013 and replaces the need to use convertible notes and other forms of non-standard investment agreements. Boggiano Aff. ¶ 27; *see also* R. Brown & A. Gutterman, Representing Startups § 4:10 (2025–2026 ed.) (explaining that the SAFE was created by Y Combinator "with the intention of providing the startup investment community an

approximately 26 investors include a partial owner of a professional sports team, several former professional baseball players, former Division 1 athletes, a former Chief Executive Officer of a major financial institution, a retired and well-known college soccer coach, a retired full colonel of the United States Army, and the General Manager of the baseball department of a top ten academic university. *Id.* ¶ 14. Many of its investors are also advisors. *Id.* As of July 2026, GameRun has two full-time employees, approximately 15 contractors, approximately 20 advisors, and multiple interns. *Id.* ¶ 17.

GameRun conducted a SAFE financing round in March 2026 in order to scale revenue and to be able to move to a Series A round of financing. *Id.* ¶¶ 16, 18. As part of that round, on or about March 7, 2026, Boggiano contacted Insalaco to discuss with him a potential investment in GameRun. FAC ¶ 20; Insalaco Aff. ¶ 4.

On March 12, 2026, GameRun and Insalaco entered into the SAFE Agreement. Insalaco Aff. ¶ 5; Dkt. No. 29 at 4. The SAFE Agreement provided that Insalaco would invest a total of $3,500,000 in GameRun in exchange for the contractual right to preferred shares at a contractually negotiated price in GameRun in the event that GameRun issued and sold preferred stock in a bona fide transaction or series of transactions. Dkt. No. 20-1 ("SAFE") at 1–2. GameRun represented that the sale and issuable securities of the SAFE "are and will be exempt from the registration and prospectus delivery requirements of the [Securities Act of 1933]," and "have been registered or qualified (or are exempt from registration and qualification) under the registration, permit or qualification requirements of all applicable state securities laws." SAFE

---

easy-to-understand investment agreement template that would not require extensive negotiation or additional legal documentation").

§ 7(g) (alterations made). In connection with that investment, Insalaco made the following representations, among others:

> . . . (b) The Investor is purchasing this SAFE and the securities to be acquired by the Investor hereunder solely for its own account for investment, not as a nominee or agent, and not with a view to the public resale or distribution thereof within the meaning of the Securities Act, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same, and does not presently have reason to anticipate a change in such intention.
>
> (c) The Investor is familiar with the definition of, and qualifies as, an accredited investor as such term is defined in Rule 501 of Regulation D under the Securities Act, and acknowledges and agrees that if not an accredited investor at the time of the Qualified Financing, the Company may void this SAFE and return the Purchase Amount.
>
> (d) The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of its investment, is able to incur a complete loss of its investment without impairing the Investor's financial condition and is able to bear the economic risk of such investment for an indefinite period of time.
>
> (e) The Investor has been advised that this SAFE and the underlying securities have not been registered under the Securities Act, or any state securities laws and, therefore, may be resold without registration under the Securities Act only in certain limited circumstances. The Investor further understands that the Company is under no obligation to register this SAFE and the underlying securities, and the Company has no present plans to do so.

*Id.* § 8(b)–(e).

Insalaco agreed that he would not make any disposition of all or any portion of the securities issuable upon conversion of the SAFE until there was a registration statement under the Securities Act covering such proposed disposition and that the disposition was made in accordance with the registration statement. *Id.* § 8(f)(1). He also agreed not to transfer the SAFE without the consent of GameRun. *Id.* § 9(d).

Insalaco negotiated the SAFE Agreement with Rathi. Boggiano Aff. ¶ 5; SAFE at 8. Prior to making the investment, Insalaco had access to the GameRun data room and conducted extensive due diligence. Boggiano Aff. ¶ 44. He signed the SAFE Agreement on March 12,

2026 and later that same day wired $1,300,000 to GameRun's operating account as directed by Rathi. Insalaco Aff. ¶¶ 5, 7. Insalaco has failed to fund the remaining $2.2 million in his SAFE. Boggiano Aff. ¶ 19.

Insalaco claims that Boggiano and Rathi made material misrepresentations to him to induce him to invest in GameRun. Insalaco Aff. ¶ 8. GameRun denies those allegations. Boggiano Aff. ¶¶ 37–51. They are not at issue on this motion. Also not at issue is that, after transferring the $1,300,000, Insalaco sought rescission and the return of his investment and GameRun refused. Insalaco Aff. ¶¶ 8–9, 21. Insalaco claims, and GameRun does not dispute, that GameRun has not segregated Insalaco's investment and has been actively using the $1,300,000 he invested for ongoing operations, including employee salaries, vendor payments, and general overhead. *Id.* ¶¶ 9, 18.

During the months prior to the March 2026 financing round in which Insalaco participated, GameRun contractors and advisors were actively recruiting potential hires and potential employees who were waiting on the execution of that round to become full-time employees. Boggiano Aff. ¶ 15. After that round was funded, GameRun turned away interested investors and halted its fundraising efforts. *Id.* ¶ 16. As a result of Insalaco's lawsuit and his failure to fund the remaining $2.2 million, however, GameRun has halted its Series A raise and instead moved to a bridge round. *Id.* ¶¶ 19–20. In addition, GameRun has been forced to make other substantial changes to its roadmap, including delaying the implementation of a critical technology upgrade and altering its marketing roadmap. *Id.* ¶ 23.

## PROCEDURAL HISTORY

GameRun initiated this action by filing a complaint against Insalaco on May 26, 2026, asserting claims for breach of contract and tortious interference with business relations regarding Insalaco's failure to fulfill his SAFE commitment. Dkt. No. 2 ¶¶ 53–73. On June 3, 2026,

Insalaco filed an answer and affirmative defenses to GameRun's complaint as well as counterclaims and third-party claims against Boggiano and Rathi alleging fraud. Dkt. No. 13 ¶¶ 91–156. Insalaco also filed an emergency motion for a temporary restraining order and a preliminary injunction, requesting that GameRun be enjoined from using, transferring, dissipating, encumbering, or otherwise disposing of any portion of the $1,300,000 wired to GameRun on March 12, 2026. Dkt. No. 10 at 15. The Court denied the motion without prejudice to renewal on June 9, 2026 following a hearing. Dkt. No. 17.

On June 12, 2026, Insalaco filed a renewed motion for emergency injunctive relief and supporting affidavit, Dkt. Nos. 19, 20, as well as an amended answer, affirmative defenses, counterclaims, and third-party claims, Dkt. No. 24. GameRun filed an amended complaint on June 16, 2026. Dkt. No. 22. Insalaco filed a second amended answer, affirmative defenses, counterclaims, and third-party claims on June 16, 2026. Dkt. No. 26. Insalaco's renewed motion and responsive pleading have dropped all fraud claims and proceed primarily on a "strict liability" rescission theory. Dkt. No. 19 ¶ 1; Dkt. No. 26 ¶¶ 32–53. Insalaco brings causes of action against GameRun, Boggiano, and Rathi jointly and severally for sale of an unregistered security in violation of both Section 12(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(1), and Chapter 90 of the Nevada Securities Act, NRS 90.460, NRS 90.660(1), as well as for misrepresentation in connection with a securities offering in violation of Section 12(a)(2). Dkt. No. 26 ¶¶ 32–48. Insalaco also brings a claim for control person liability under Section 15 of the Securities Act against Boggiano and Rathi individually. *Id.* ¶¶ 49–53.

On June 30, 2026, GameRun, Boggiano, and Rathi jointly filed a reply and answer to Insalaco's second amended counterclaims and third-party claims. Dkt. No. 27. On July 10, 2026, they filed a memorandum of law in opposition to Insalaco's renewed motion for a

preliminary injunction, attaching an affidavit from Boggiano and correspondence with Insalaco in support. Dkt. No. 29. On July 17, 2026, Insalaco filed a reply memorandum of law in further support of his motion for emergency injunctive relief. Dkt. No. 40.

**CONCLUSIONS OF LAW**

"A party seeking a preliminary injunction must demonstrate: (1) 'a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor'; (2) a likelihood of 'irreparable injury in the absence of an injunction'; (3) that 'the balance of hardships tips in the plaintiff's favor'; and (4) that the 'public interest would not be disserved' by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (quoting *Salinger v. Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010)).[3] "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)). "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Id.* (quoting *Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 542 (1987)).

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faively Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)); *see Singas Famous Pizza Brands Corp. v. N.Y. Adver. LLC*, 468 F. App'x 43, 45 (2d Cir. 2012) (summary order). "To satisfy the irreparable harm requirement, Plaintiff[] must demonstrate that

---

[3] The Court assumes without deciding that the relief that Insalaco seeks is best described as a status quo injunction rather than a mandatory injunction. *See N. Am. Soccer League, LLC v. U.S. Fed'n, Inc.* 883 F.3d 32, 36–37 (2d Cir. 2018) (discussing differences between mandatory injunction and status quo injunction).

absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faively*, 559 F.3d at 118 (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)). "[C]ourts must not simply presume irreparable harm . . . plaintiffs must show that, on the facts of their case, the failure to issue an injunction would actually cause irreparable harm." *Salinger*, 607 F.3d at 82. The "mere possibility of irreparable harm is insufficient to justify the drastic remedy of a preliminary injunction." *Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, 934 F.2d 30, 34 (2d Cir. 1991).

"To establish a likelihood of success on the merits, a plaintiff 'need not show that success is an absolute certainty. [It] need only make a showing that the probability of [its] prevailing is better than fifty percent.'" *Broker Genius, Inc. v. Volpone*, 313 F. Supp. 3d 484, 497 (S.D.N.Y. 2018) (quoting *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988)).

Insalaco's motion fails in many respects. First, Insalaco has failed to show a likelihood of success. Insalaco bases his motion on the claim that because GameRun failed to file a Form D with the United States Securities and Exchange Commission ("SEC") within 15 calendar days of the SAFE Agreement, it failed to "perfect" its right to enjoy the safe harbor for private placements under SEC Rule 506, giving him a right of rescission. Dkt. No. 19 ¶¶ 1, 2, 9–12. Insalaco's predicate is faulty.

Section 5 of the Securities Act makes it unlawful for a person to sell a security through an unregistered offering, and Section 12(a)(1) "gives a person who purchases a security that has been sold without a registration statement what is, in effect, a private right of rescission." *May v. Barclays PLC*, 2025 WL 887300, at *10 (S.D.N.Y. Mar. 21, 2025), *reconsideration denied*, 2025

WL 1569633 (S.D.N.Y. June 3, 2025), and *aff'd sub nom. Knapp v. Barclays PLC*, 171 F.4th 166 (2d Cir. 2026).

However, Section 4(a)(2) of the Securities Act exempts from the registration process "transactions by an issuer not involving any public offering." 15 U.S.C. § 77d(a)(2); *see also* 1 A.A. Sommer, Jr., Sec. Law Techs. § 1.04 (2026) (noting that Section 4(a)(2) provides an exemption from the registration requirements of Section 5 for private placements); *SEC v. Ralston Purina*, 346 U.S. 119, 125 (1953) ("[T]he applicability of [Section 4(a)(2)] should turn on whether the particular class of persons affected need the protection of the [Securities] Act. An offering to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering.'"). As relevant here, Rule 506 of SEC Regulation D, promulgated thereunder, provides a safe harbor, deeming that an offer or sale of a security does not constitute a public offering within the meaning of Section 4(a)(2) when (1) the securities are not sold "by any form of general solicitation or general advertising"; (2) they cannot be resold without registration under the Securities Act or an exemption therefrom; (3) there are not more than 35 purchasers of the securities from the issuer in any 90-day period; and (4) each purchaser is an accredited investor. 17 C.F.R. §§ 230.502, 230.506(b); 7B J. William Hicks, Exempted Trans. Under the Securities Act of 1933 § 11:27 (2026) (explaining legislative history of "traditional safe harbor exemption" in Rule 506(b)). A separate rule, SEC Rule 503, requires an issuer offering or selling securities in reliance on § 230.504 or § 230.506 to file with the SEC a notice of sales containing the information required by Form D for each new offering of securities no later than 15 calendar days after the first sale of securities in the offering. 17 C.F.R. § 230.503(a)(1).

Insalaco argues that GameRun did not file a Form D in connection with the SAFE and that the "confirmed absence of any Form D on EDGAR" establishes that he "has an identical strict liability right to rescission under federal law" as well as under Nevada law, and that GameRun's founders "are personally and individually jointly and severally liable" to him. Dkt. No. 19 ¶ 2. Insalaco claims that "[t]he evidentiary basis for [his] motion is entirely documentary and is not subject to any genuine factual dispute." *Id.* ¶ 1. Insalaco's argument is flawed.

Contrary to Insalaco's argument, the filing of a Form D with the SEC is not necessary to "perfect any available exemption" under the Securities Act of 1933, *id.*, and the failure to timely file such a form does not disqualify the offering from the protection of the safe harbor. The consequence of the failure to file a Form D is to put at risk the issuer's ability to use the safe harbor in the future. As originally promulgated and as it was amended over time, Form D was intended "to serve an important data collection objective." Elec. Filing & Simplification of Form D, 73 Fed. Reg. 10592 (Feb. 27, 2008). "[T]he Form D filing serves two primary purposes: [c]ollection of data for use in the Commission's rulemaking efforts; and [e]nforcement of the federal securities laws, including enforcement of the exemptions in Regulation D." *Id.* at 10593.[4] Since 1989, the filing of a Form D has not been a condition to the availability of an exemption. *Id.*; *see also* Regul. D, Accredited Inv. & Filing Requirements, 54 Fed. Reg. 11369 (Mar. 20, 1989) ("While the filing of Form D has been retained, it will no longer be a condition to any exemption under Regulation D."); 7B J. William Hicks, Exempted Trans. Under the Securities Act of 1933 § 11:177 (2026) ("An exemption under Section 4(a)(2) is not conditioned on any filings with the SEC. Where an issuer claims Section 4(a)(2) by reason of the safe harbor

[4] The SEC has also recognized that the information in the Form D may be useful for investors. *Id.*

constructions of that exemption, set forth in Rule 506(b) and Rule 506(c), it must satisfy the filing obligations of Rule 503."); *Mgmt. Assistance Inc. v. Edelman*, 584 F. Supp. 1021, 1036 (S.D.N.Y. 1984) (plaintiff did not establish probable success on merits of claim that defendants violated Section 5 where it offered evidence that no registration statement or Form D was filed, but ignored that "[i]ssuers can take advantage of [the Section 4(a)(2) exemption] without filing with the SEC and without satisfying the requirements of a particular rule or regulation"). Instead, issuers are incentivized to file a Form D as a result of the disqualifying provision of Section 507. Under that provision, an issuer may lose the right to use the exemptions available under Sections 504 and 506 if it is subject to an injunction for failing to file a Form D. 17 C.F.R. § 230.507(a). The fact that GameRun did not file a Form D thus does not give Insalaco a right of rescission.

Insalaco pivots in his reply memorandum in support of the preliminary injunction. He recognizes that "a Form D filing is not itself a condition of the Rule 506 exemption." Dkt. No. 40 ¶ 10. He now argues instead that GameRun has failed to establish that the SAFE was exempt from registration under Rule 506 in the first place. *Id.* ¶ 1. He claims that GameRun's response to his motion, which did not demonstrate that GameRun satisfied all of the requirements of Rule 506, necessarily establishes that the offering did not meet the requirements of that rule.[5]

[5] Insalaco argues in his reply memorandum that the SAFE was not a private placement because the offering "spanned multiple rounds, various caps, 26 investors, and active recruiting," yet "GameRun offered no evidence of the accreditation, sophistication, or informational access of any offeree other than Defendant . . . no purchaser list, no accreditation records, no solicitation communications" in its data room or elsewhere. Dkt. No. 40 ¶¶ 7–9. But the threshold under Rule 506(b) is 35 purchasers of securities, and the issuer need only establish a "reasonable belief" that investors are accredited prior to the sale. 17 C.F.R. §§ 230.501(a), 230.506(b)(2)(1). Moreover, when offering securities in a private placement to accredited investors under Rule 506(b), the issuer is not legally required to provide a standardized disclosure package or specific financial statements. 17 C.F.R. § 230.502(b)(1). Insalaco represented that he was an accredited investor, SAFE § 8(c); the SAFE bears securities transfer-restriction legends, *id.* § 9(d), Dkt. No.

Insalaco cannot sustain a motion for a preliminary injunction based on claims made in reply that he did not make either in his motion for a preliminary injunction or in his counterclaims and third-party claims. A party seeking a preliminary injunction must set forth in his motion papers the grounds upon which he seeks an injunction and the evidence supporting the motion. *See Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007) (party moving for preliminary injunctive relief must make a "clear showing" that elements are established) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)); *Stern v. Highland Lake Homeowners*, 2021 WL 1164718, at *5 (S.D.N.Y. Mar. 26, 2021) ("[O]n a motion for preliminary injunction, it has always been the rule that the movant bears the burden of persuasion to establish the situation meets the standard for a preliminary injunction, and must offer proof beyond the unverified allegations of the pleadings." (internal citation and quotation marks omitted)); *Thurman v. Bun Bun Music*, 2015 WL 2168134, at *4 (S.D.N.Y. May 7, 2015) ("[A] plaintiff seeing [sic] injunctive relief must justify that application by evidentiary submissions.").

A party whose conduct is sought to be restrained is entitled to know the basis upon which such relief is being sought and to have an opportunity to respond. *See Rosen v. Siegel*, 106 F.3d 28, 31 (2d Cir. 1997) (explaining that the purpose of Fed. R. Civ. P. 65's notice requirement is "to give the opposing party a fair opportunity to oppose the motion for a preliminary injunction . . . and the court must allow that party sufficient time to marshal its evidence and present [its] arguments against the issuance of the injunction") (internal citations omitted); *see also Akinlawon v. Polanco*, 2022 WL 3646004, at *2 (S.D.N.Y. Aug. 24, 2022) (instructing plaintiff to "clarify the basis on which he seeks injunctive relief" so that defendants

---

19 ¶ 7; and there is no evidence of a general solicitation or advertising of any kind, Dkt. No. 29 at 6.

can be "afforded an opportunity to respond"). For that reason, "new arguments may not be made in a reply brief." *Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir. 1999) (citing *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993)); *see also Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of New York*, 700 F. Supp. 3d 86, 98 n.5 (S.D.N.Y. 2023) (finding that plaintiff abandoned basis for claimed preliminary injunction where it did not raise claim in opening brief and only addressed grounds for relief on that claim in its reply). To allow otherwise would be to deny the moving party's opponent the opportunity to respond. *Cf. Dong v. Miller*, 2018 WL 1445573, at *6 (E.D.N.Y. Mar. 23, 2018) (finding that "[b]y filing an amended complaint after Defendants filed their opposition to his motion for a preliminary injunction, Plaintiff effectively shifted the legal ground under this case," but no unfair prejudice resulted from magistrate's consideration of newly raised arguments because defendants then had opportunity to file a sur-reply brief).

Insalaco has engaged in a bait-and-switch that attempts to achieve exactly what the rules against new claims in reply seek to proscribe. Insalaco's second amended answer, affirmative defenses, counterclaims, and third-party claims were based on a single theory. Insalaco alleged that GameRun was required to timely file a Form D with the SEC in order to "validly establish and maintain the Rule 506(b) exemption," and was further required to complete a notice filing with Nevada of the same. Dkt. No. 26 ¶¶ 27–28. Insalaco claimed that because "no valid exemption from Section 5's registration requirement was perfected," he is entitled to a right of rescission under both federal and Nevada securities law. *Id.* ¶¶ 35, 45. That was the only theory upon which Insalaco's pleading proceeded.

Consistent with that claim, Insalaco moved for a preliminary injunction on the basis that the failure to file a Form D established a violation of Section 5 of the Securities Act and the

corresponding provision of Nevada law, giving him a right to rescission. Dkt. No. 19 ¶¶ 9–14; *see also id.* ¶ 1 ("The evidentiary basis for this motion is entirely documentary and is not subject to any genuine factual dispute."), ¶ 21 ("This case presents the unusual circumstance in which likelihood of success on the merits is established not by the strength of disputed factual allegations, but by a purely documentary, legally undisputable showing."). Insalaco did not once suggest that the offering did not qualify for an exemption under Section 4(a)(2) or the SEC safe harbor. To the contrary, the claim regarding the failure to file a Form D necessarily presumed that the offering otherwise was qualified for an exemption under Rules 504 or 506. There is no requirement to file a Form D for offerings other than those made under Rules 504 or 506.

GameRun countered that argument in its opposition memorandum, demonstrating definitively that Insalaco's argument was ill-founded. Dkt. No. 29 at 7–8. The filing of a Form D is not a condition to the availability of the safe harbor under Rule 506. Insalaco has now conceded as much. GameRun did not demonstrate that the SAFE satisfied all of the requirements of Rule 506 (other than the asserted but flawed requirement to timely file a Form D). But that is because Insalaco never claimed that the SAFE did not satisfy those requirements. The Court cannot and will not draw an inference against GameRun from its failure to respond to an argument that Insalaco never made, nor grant a preliminary injunction on the basis of a claim not made either in Insalaco's pleading or in his motion.

Insalaco's claim under Nevada's Blue Sky law has no greater likelihood of success. Insalaco argues that "NRS 90.460 prohibits the offer or sale of any security in Nevada unless the security is registered or the security or transaction is exempt under Chapter 90," and the SAFE "was not registered with the Nevada Securities Division." Dkt. No. 26 ¶ 24. Because GameRun was required to make a notice filing with respect to the SEC Form D by March 27, 2026 in order

to "validly establish the exemption under Nevada law" and failed to do so, "no valid exemption from registration was established" under NRS 90.460. *Id.* ¶¶ 28–31; *see also* Dkt. No. 19 ¶ 27 ("NRS 90.460 prohibits the offer or sale of any security in Nevada unless the security is registered or the transaction is exempt under Chapter 90. The SAFE was not registered. No valid exemption was perfected."). As discussed *supra*, Insalaco concedes that Form D is not a condition to exemption. Nor does he contest that NRS 90.530(11) "creates a self-executing exemption for limited private offerings and contains no filing requirement." Dkt. No. 29 at 11; Dkt. No. 40 ¶ 13. On reply, however, he again attempts to raise for the first time that GameRun has not satisfied its burden to prove the offering's compliance with each of NRS 90.530(11)'s substantive conditions.[6] Dkt. No. 40 ¶ 13. The Court will not entertain this argument, either.

Moreover, Insalaco agreed at the hearing on his motion that if the offering qualifies as exempt under Rule 506, his separate claim regarding the sale of an unregistered security in violation of NRS 90.460 and 90.660(1) would be preempted by the National Securities Markets Improvement Act ("NSMIA"). NSMIA preempts state authority to require substantive

---

[6] NRS 90.530(11) provides that a transaction is exempt from registration if: "(a) [t]he transaction is part of an issue in which there are not more than 35 purchasers in this State . . . during any 12 consecutive months; (b) [n]o general solicitation or general advertising is used in connection with the offer to sell or sale of the securities; (c) [n]o commission or other similar compensation is paid or given, directly or indirectly, to a person, other than a broker-dealer licensed or not required to be licensed under this chapter, for soliciting a prospective purchaser in this State;" and (d) either "(1) [t]he seller reasonably believes that all the purchasers in the State . . . are purchasing for investment; or (2) [i]mmediately before and immediately after the transaction, the issuer reasonably believes that the securities of the issuer are held by 50 or fewer beneficial owners, other than those designated in subsection 10, and the transaction is part of an aggregate offering that does not exceed $500,000 during any 12 consecutive months." NRS 90.530(11). Even if the Court were to consider Insalaco's argument, the facts nevertheless indicate that the offering is exempt from Nevada's registration requirements: the transaction was not part of an issue in which there were more than 35 purchasers in the state, there is no evidence of any general solicitation or advertising in connection with the offering, and GameRun reasonably believed that Insalaco was purchasing for investment. Insalaco Aff. ¶¶ 4–5.

registration or qualification for Rule 506 offerings. 15 U.S.C. 77r(b)(4)(F) (providing that a security exempt from federal registration under 17 C.F.R. § 230.506 is a "covered security" and is exempt from state registration requirements); *see also* 1 T. Lee Hazen, Law Sec. Reg. § 4:92 (2026) ("[W]hen the transaction qualifies for Rule 506's safe harbor, there is an exemption from state law registration requirements."); *Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 108 (2d Cir. 2001) ("The primary purpose of NSMIA was to preempt state 'Blue Sky' laws which required issuers to register many securities with state authorities prior to marketing in the state.").[7]

Insalaco also has not shown irreparable harm. Insalaco argues that he will suffer irreparable harm in the absence of a preliminary injunction because, should he succeed at trial of this case, GameRun will not have the funds to satisfy his rescission claim. *See* Dkt. No. 19 ¶ 16 ("GameRun is actively using the $1,300,000 for . . . employee salaries, vendor payments, and general overhead . . . [t]he $1,300,000 has not been segregated, escrowed, or otherwise preserved."); Dkt. No. 40 ¶ 2 (characterizing Boggiano's statements that repayment would be "dependent on new capital" and that GameRun "likely would have to close the business" as admissions that "a money judgment would likely be uncollectible").

Irreparable harm is "harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Salinger*, 607 F.3d at 81; 13 Moore's Federal Practice – Civil § 65.22 (2026) ("[I]rreparable injury is an injury for which the court could not compensate the movant should the movant prevail in the

---

[7] States retain jurisdiction to enforce mandatory notice filing and fee requirements. *See* 7B J. William Hicks, Exempted Trans. Under the Securities Act of 1933 § 11:177 (2026) ("Under NSMIA pre-emption, states also retain authority to investigate and bring enforcement actions for fraud, impose state notice filing requirements and state filing fees."). However, Insalaco cannot bring a claim regarding Nevada's substantive registration requirements.

final decree"). Generally, "irreparable harm exists only where there is a threatened imminent loss that will be very difficult to quantify at trial." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 38 (2d Cir. 1995). Thus, "lost income or other economic loss that is calculable and compensable by monetary damages ordinarily will not be considered an irreparable injury." 13 Moore's Federal Practice – Civil § 65.22 (2026); *see also ESPN Enters., Inc. v. DISH Network L.L.C.*, 810 F. Supp. 3d 452, 460 (S.D.N.Y. 2025) (television network failed to show irreparable harm where it alleged that streaming platform's violation of licensing agreement would cause network to suffer harm to its relationships with other distributors, business model, value and brand, direct-to-consumer streaming service, and right to exclude unauthorized distribution, but failed to show that any of those alleged harms could not be "measured and remedies through money damages"). Such harm can be remedied after a final adjudication on the merits.

Courts have carved out only a limited exception to the rule that harm compensable by money damages is not irreparable. "[C]ourts that have found irreparable injury because of the risk that a judgment will not be satisfied have required a showing that the defendant is insolvent, is on the verge of insolvency, or has tried to transfer or conceal assets." *Pamlab, L.L.C. v. Macoven Pharms., L.L.C.*, 881 F. Supp. 2d 470, 480 (S.D.N.Y. 2012) (collecting cases); *accord Mitsubishi Power Systems, Inc. v. Shaw Group. Inc.*, 2004 WL 527047, at *2, *4 (S.D.N.Y. Mar. 16, 2004) (denying injunction in absence of showing "substantial chance" that defendant would be insolvent upon final resolution of pending proceedings). As a general matter, in the absence of fraudulent conveyance, "a debtor may prefer one creditor to another, in discharging his debts, whose assets are wholly insufficient to pay all the debts." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 321–22 (1999) (quoting 1 Commentaries on Equity Jurisprudence § 12, pp. 14–15 (1836)).

Insalaco's claim is the paradigmatic one that is compensable by money damages. Insalaco seeks the return of his $1.3 million partial payment with interest. If he establishes that claim, he will receive a judgment for money. He claims no harm other than harm that is monetary and can be redressed through monetary relief. *See Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (movant must show harm "for which 'money damages cannot provide adequate compensation'") (internal citation omitted); *Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999) ("As a general matter, because monetary injury can be estimated and compensated, the likelihood of such injury usually does not constitute irreparable harm.").

Moreover, assuming without deciding that a court would have the power to grant preliminary injunctive relief to protect the right to rescissory relief under Section 12(a)(1),[8] Insalaco has also not shown that a potential judgment against GameRun would be uncollectible. In his opening brief, Insalaco argues that his statutory rescission remedy will be permanently destroyed "[i]f the $1,300,000 is dissipated before judgment," and speculates that "GameRun's total available funds may already be less than $1,300,000 as a result of ongoing expenditures since March 12, 2026." Dkt. No. 19 ¶¶ 32, 36. On reply, Insalaco acknowledges that GameRun is marketing millions in "pipeline value" to prospective investors and forecasts significant revenue for fiscal year 2027, Dkt. No. 40 ¶ 17, but claims these facts are in tension with GameRun's representation that if the Court were to enter an order requiring that it return or

[8] GameRun argues that the relief Insalaco seeks is barred by *Grupo Mexicano*, where the Supreme Court held that a district court has no power to enjoin a defendant from disposing of its assets pending adjudication of a claim for money damages where the plaintiff claims no lien or equitable interest in those assets. 527 U.S. at 318–33. Because the instant motion can be disposed of on the basis of the four injunction factors alone, the Court has no occasion to reach the question of whether *Grupo Mexicano* independently would bar Insalaco's claim for preliminary injunctive relief.

freeze Insalaco's $1.3 million wire, GameRun "likely would have to close the business," Boggiano Aff. ¶ 21.

Insalaco, however, confuses cash availability with insolvency. It may be that GameRun does not have the immediate cash on hand to immediately write a check to Insalaco for $1.3 million. It may use the cash that it has raised for the purposes for which it claims to have raised it—its operations. It may pay employees, sign contracts, make investments, and plan for the Series A offering. But that does not mean that GameRun will be judgment proof at the time that Insalaco obtains a judgment. *See Pandora Select Partners, LP v. Strategy Int'l Ins. Grp., Inc.*, 2006 WL 8460016, at *2 (S.D.N.Y. Aug. 11, 2006) ("A showing of irreparable injury cannot be made based on a litigant's fear that a defendant may not have assets to pay a future judgment."). Insalaco has pointed to no evidence that GameRun is dissipating its assets. If the managers of GameRun are using its funds to pay employees and other expenses in anticipation of a Series A offering, that is what they told investors they would be doing. The managers have a duty to all investors to act in the best interests of GameRun as a whole, even if doing so might not be consistent with the wishes of Insalaco as an individual investor. Those interests presumably include taking the steps that would give all investors—not just Insalaco—the equity stake in GameRun, available only if GameRun is able to make that offering.[9]

[9] As further support for his irreparable harm showing, Insalaco argues that "[a] constructive trust in Defendant's favor arose" on Insalaco's $1.3 million payment "by operation of statute at the moment GameRun received them without a valid exemption or registration in place," and therefore the funds "never lawfully became part of GameRun's estate in a sense that permits them to be dissipated or used to satisfy other obligations ahead of Defendant's rescission claim." Dkt. No. 19 ¶ 34. "Under New York law, a party claiming entitlement to a constructive trust must ordinarily establish four elements: (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment." *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 352 (2d Cir. 1992). However, "[p]urely commercial transactions do not give rise to a fiduciary relationship." *Id.* at 353. Here, Insalaco and GameRun stood in an ordinary, arms-length commercial relationship,

Finally, the "balance of hardships" and "public interest" each favor GameRun. *N. Am. Soccer League*, 883 F.3d at 37. Insalaco seeks the return of the $1.3 million he paid pursuant to the SAFE. Dkt. No. 26 ¶¶ 37, 42, 47, 53; Dkt. No. 19 ¶ 4. For its part, GameRun seeks the remaining $2.2 million that Insalaco promised to pay pursuant to the SAFE. Dkt. No. 22 ¶¶ 56–62. Insalaco seeks the $1.3 million personally. As Insalaco admits, if GameRun is not enjoined from spending the money or if it is put in escrow, GameRun will spend the money on its operations, including on its employees. Dkt. No. 19 ¶ 16. That does not establish a balance of hardships in favor of Insalaco. Insalaco represented in the SAFE that he could "incur a complete loss of [his] investment without impairing [his] financial condition and is able to bear the economic risk of such investment for an indefinite period of time." SAFE § 8(d). By contrast, GameRun would be deprived of the ability to invest the money that Insalaco paid pursuant to the SAFE for the purposes for which that money was paid: to benefit all of GameRun's stakeholders. Insalaco "faces only a delay in collecting money he can, if he were correct, fully recover through an ordinary judgment," and may even get a windfall should GameRun "advance to a stage where further investment triggers Defendant's rights under the SAFE." Dkt. No. 29 at 16.

---

*see* Insalaco Aff. ¶¶ 4–7, and Insalaco has offered no evidence that GameRun was unjustly enriched. In exchange for Insalaco's investment, GameRun assumed corresponding obligations to, for example, automatically convert the SAFE into SAFE Preferred Stock at the price specified in the contract upon raising at least $1,000,000 in a bona fide equity round, and to pay Insalaco the greater of his original investment or the converted common stock value immediately upon a liquidity event. SAFE §§ 1, 3. Insalaco's argument thus would have extraordinary consequences. Upon his hypothesis that GameRun was unjustly enriched because it is using the money he invested with GameRun for its operations, all money raised in any offering—whether exempt or not—would potentially be subject to a constructive trust, at least until the statute of limitations has run. Insalaco's claim may potentially give rise to a claim for rescissory relief at the conclusion of these proceedings. It does not impose a constructive trust enforceable at the beginning of the proceedings on every cent that GameRun has raised in every offering it has made.

The public interest also disfavors relief. Insalaco invokes the general principle that securities issuers should be held to their responsibilities under the securities laws. *See* Dkt. No. 40 ¶ 25 ("A rule under which exemptions are presumed and notice obligations are consequence-free would render the securities laws' protections illusory[.]"). GameRun invokes the sanctity of contract. Insalaco contracted to pay GameRun $3.5 million for it to invest, of which he has paid only $1.3 million. The proposition for which Insalaco argues admits of no limiting principles. It is one that would, in fact, be destructive of the securities laws and the capital markets they are intended to regulate. Insalaco argues, in essence, that whenever a person asserts a claim under Section 12(a)(1) for rescission, he can establish irreparable harm if he shows that the issuer against which he asserts the claim does not have the cash on hand to pay off that claim and can prevent the issuer from spending the money that it has raised for the purposes for which it was raised. He makes his particular claim individually and on the basis of the failure to file a Form D, but it cannot be so limited.

Section 12(a)(1) provides a rescissory remedy in connection with any offering that is intended to be exempt but, for one reason or another, does not qualify for an exemption or is not considered a private offering. It provides for strict liability. 15 U.S.C. § 77l(a)(1); *see Cobalt Multifamily Invs. I, LLC v. Arden*, 857 F. Supp. 2d 349, 356 (S.D.N.Y. 2011) ("[S]elling unregistered securities is a strict liability offense."); *S.E.C. v. U.N. Dollars Corp.*, 2003 WL 192181, at *2 (S.D.N.Y. Jan. 28, 2003), *aff'd sub nom. S.E.C. v. Harris*, 96 F. App'x 778 (2d Cir. 2004) ("[S]cienter is not an element of a Section 5 violation.") (citing cases). "[T]ransactions must be carefully structured and documented in order to be sure of securing an exemption." 1 T. Lee Hazen, Law Sec. Reg. § 4:4 (2026). There are numerous pitfalls for the unwary. *See id.* (discussing that "one non-qualifying offeree or purchaser can destroy the

exemption with regard to all who purchased securities in the would-be exempt offering" and that the integration doctrine presents another hurdle). "Even one deviation from an exemption's requirements can have dire results even if it occurs only with respect to one of many transactions." *Id.*

Section 12(a)(1) claims are sometimes brought individually, but can also be brought on behalf of a class. *See, e.g.*, *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 352–57 (S.D.N.Y. 2019) (denying motion to dismiss class action against startup alleging Section 12(a)(1) claims arising out of sale of unregistered securities through initial coin offering of digital asset); *Samuels v. Lido Dao*, 757 F. Supp. 3d 951, 967–70 (N.D. Cal. 2024) (investor's putative class action complaint plausibly alleged that issuer of cryptocurrency tokens was statutory seller of unregistered securities and Section 12(a)(1) claims could proceed to discovery). And, even if class claims are not asserted, they can always be threatened.

The securities laws are intended to protect the integrity of the capital markets on behalf of all investors. *See Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 378 (2014) ("The basic purpose of the 1934 and 1933 regulatory statutes is to protect investor confidence in the securities markets."). They are not intended to provide broad insurance against risk of loss. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).

If Insalaco's claim were accepted, however, it would undermine the security of all private offerings and thus impair the very efficiency and fairness that the securities laws were intended to achieve. Any individual investor in an unregistered offering would be able to demand that its investment be returned or that it be paid off in some other manner lest it bring an action that would threaten that the issuer be confronted with an order—issued before there was any finding of liability—that it not be able to use any of the funds it has raised from all of the investors who

have purchased in the offering. Companies raise funds in order to invest them. But under Insalaco's reading of irreparable harm under the Securities Act, the prudent issuer (or those relying on the funds it has raised) would either have to wait for the one-year limitations period under Section 12(a)(1) to expire or else simply refrain from conducting an unregistered offering at all. Such a result would be diametrically opposite to what the public interest requires.

**CONCLUSION**

For the foregoing reasons, Insalaco's motion for a preliminary injunction is DENIED. The Clerk of Court is respectfully directed to close Dkt. No. 19.

SO ORDERED.

Dated: July 28, 2026
New York, New York

LEWIS J. LIMAN
United States District Judge